William W. Williams v. John L. Spurr and others.

*Iron lands: Fraudulent concealment: Misrepresentations: Value: Bill to set aside sale of lands.* A court of equity will not set aside a sale of lands, in the absence of any relation of confidence between the buyer and seller, at the instance of a complainant, who was a dealer and speculator in iron lands and had discovered iron ore upon the lands in question, and had entered and bought them for iron lands, and who, during the negotiations for their sale, to enhance their price, mentioned the fact that there was a very good show of iron upon them, and finally sold them on that basis at a price largely in excess of their value as timbered lands, and against defendants, who falsely pretended, after they had examined the lands and discovered that they were very valuable iron lands, that they wished to buy them for the timber on them to fill a timber contract, and concealed their discoveries of iron with a view of getting them at less than they considered them worth, and finally bought them at a price below their supposed value, on the ground of fraudulent concealment and misrepresentation of value.

*Heard January 10. Decided April 3.*

Appeal in Chancery from Houghton Circuit.

This bill was filed by William W. Williams against John

L. Spurr, Thomas B. Brooks, Raphael Pumpelly, William H. Stevens and Charles H. Palmer. The defendants answered, and proofs were taken. On the hearing the bill was dismissed, and the complainant brings the case up by appeal.

*Hubbell & Chadbourne, Douglass & Miller, Sutherland & Wheeler, S. F. Seager* and *Ashley Pond,* for complainant.

*Wilkinson & Smith, Ball & Chandler, Moore & Griffin* and *George V. N. Lothrop,* for defendants.

CHRISTIANCY, CH. J.

The bill was filed to set aside a sale made by complainant to Spurr, Brooks and Pumpelly, of certain lands in Houghton county in the Upper Peninsula, described as the north half of the southwest quarter, and the south half of the northwest quarter, of section twenty-four, in township forty-eight north, of range thirty-one west, on the ground of fraudulent concealment or misrepresentation as to their character and value; complainant claiming by his bill that he was himself ignorant that they had any value as iron lands, or for mines of iron upon them, and that he believed them to have no value except for the wood and timber, and that he was confirmed in this belief by the false representations of the defendants. The negotiations were by letters, set forth in the bill, and will be noticed when we consider the evidence. The false representation upon which complainant alleges he was induced to sell the lands for eight thousand dollars, consisted in the representation made by Spurr, acting in concert with Brooks and Pumpelly, that the lands were valuable for timber alone, and were wanted by the purchasers for that purpose. The fraudulent concealment alleged, is that the purchasers, knowing from previous exploration of a rich

deposit of iron ore, making the lands worth two hundred thousand dollars or thereabouts, fraudulently concealed the facts from the complainant; and he alleges the truth to be that defendants purchased the lands because of the existence thereon of said rich deposits of iron and not because of their wood and timber, while they lead him to believe directly the contrary.

We have carefully considered the testimony, and shall give nearly in full the correspondence leading to the sale. The balance of the testimony is in the main harmonious, but in some particulars somewhat conflicting; and instead of entering into a full analysis of it in this opinion, we shall content ourselves with stating the conclusions at which we have arrived, as we have been able to deduce them from the whole evidence.

The complainant, who resided at Manlius in the state of New York, but who had for some years been engaged in constructing the Sault canal, and other public works in that region, wishing to invest some money in mining lands, or such as would be likely to prove valuable for iron mines, in the fall of 1860, went up to Houghton county for that purpose; and being previously informed that these lands, then belonging to the United States, had iron upon them, and being situated on what was then, and is still, known as the " Iron Range," went out with one Holliday, who had previously been upon the lands, and found iron there; and in company with Holliday examined the lands, found the lines, and not only found iron ore in loose boulders, or what is called "float ore," but was shown by Holliday the bed or deposit of ore in the ledge, or "in place" at several points on the land; and though not himself an expert in such matters, complainant was satisfied it was iron, and that the lands would prove a valuable investment as iron

24 MICH.—43.

lands; and with this view he purchased the lands of the government in October, 1860.

Though the purchase was in his own name, and the legal title of the whole remained so up to the time of sale to defendants, yet at or about the time of the purchase he sold Charles H. Palmer a one-third interest, and gave him a written agreement acknowledging that the latter had paid for the third interest, and agreeing to hold the same as trustee for him, "subject to such decision as the parties might direct from time to time."

About the same date, or shortly after, complainant bought a much larger quantity of lands, near L'Anse on the same "Iron Range," as, and for, iron lands, in part of which Palmer also was interested.

It does not appear that any offer had been made for the purchase of the lands in controversy until late in the year 1867, when Mr. C. C. Douglass (who it seems from the testimony also owned and was dealing in iron lands in that neighborhood) applied to complainant to know what he would take for the lands here in question. And on the 6th of December, 1867, complainant writes to Palmer: "I have just seen Mr. C. C. Douglass, and he wanted to know what we would take for our *iron property* over near Lake Michigammi. I told him if you were willing, we would sell it for six thousand dollars cash; and he wanted I should write you and get an answer from you as soon as I could." It is admitted that this letter refers to the land now in dispute. On the 31st of December Palmer answers him, saying: "The land  *  *  *  consists of one hundred and sixty acres. At six thousand dollars it would be about forty dollars per acre. I would sell at six thousand dollars. What does Douglass want of it? Does he want it to go with some of his own lands? My opinion now is to sell

most decidedly." He also says in a postscript: "I wish you would write me at once about the sale of iron land. Knowing what Douglass wants of it, you can tell well enough what is the most *he will* give for it; and that price I would take. It is generally better to do well than to wait upon the uncertainties of doing better."

For some reason not explained, no sale was made to Douglass; and it does not appear that any other offer was made to purchase until that which resulted in the sale now in controversy.

The evidence shows that these lands, without reference to the iron supposed to be upon them, were of no great or peculiar value for their timber; that lands equally valuable for timber could have been purchased in large amounts in that neighborhood, at the time of this contemplated sale to Douglass, at from two dollars and fifty cents up to five dollars per acre; and that the price of such timbered lands was but little higher when these lands were sold to defendants; that complainant never would have purchased them on account of any value they might be supposed to have as timbered lands, and that if he had considered them valuable only for their timber he would not, at the time Douglass proposed to purchase, have placed upon them a higher value than five dollars per acre, or eight hundred dollars for the one hundred and sixty acres, and would have considered it an advantageous sale at that price. But he bought them as iron lands and spoke of them as such in his correspondence with Palmer, and treated them as such in fixing the price.

In fact, we are satisfied from the evidence that the lands were then quite generally known as iron lands among intelligent men in that region, and that to several explorers and dealers in iron lands, they were at this time, or at least prior to the negotiation with defendants, known to

contain the deposit of magnetic iron ore, which is now supposed to give them their peculiar value, though the parties cognizant of this were reticent about it, in hopes perhaps of some day purchasing to advantage.

We now come to the transaction which resulted in the sale in controversy.

Some time about the first of October, 1868, defendants Spurr and Brooks were on this land and found iron there, which they were satisfied rendered it valuable, though their exploration was a very slight one, of but two to four hours, a considerable portion of which was spent in the attempt to find the section line, to determine whether it was on section twenty-three or section twenty-four, where the iron was found, in which, however, at this time they failed; but they became satisfied it was near the line, and if on twenty-three, that it extended also on to section twenty-four, the lands of complainant.

On the 3d of October, 1868, defendant Spurr wrote to complainant, saying: "I have some hard wood timber lands at the west end of Lake Michigammi, and having an offer to close a large wood contract with the railroad company for a term of years, I am a little doubtful whether I have secured timber enough to fill the contract, and having seen from Banfield's map that you are owner of some timber land on section twenty-four, town forty-eight north, range thirty-one west, and having business at the Sault Ste. Marie, where I met your brother a short time since, I mentioned the matter to him, that I would like to purchase these timber lands, provided you wished to sell, and we could agree on price and terms of payment."

On the 10th of the same month, the complainant, from his residence at Manlius, replies to this letter, that he is the owner of these lands (describing them) and then proceeds to say: "I do not know as you are aware that there

is a very good show of iron on this land, but still, I will sell it very reasonable, if you wish." He then tells him he will sell it for ten thousand dollars, and that he don't wish to sell any of it, unless he sells the whole; and that he may pay one-quarter down and secure the other by mortgage, and pay within one year.

Now we are entirely satisfied that this letter of Spurr, so far as it indicates a wish to purchase the land for the sake of the timber and to fill a contract proposed by the railroad company for wood, was a bald pretense without any foundation in fact, and devised for the purpose of concealing his real object in making the purchase, and his real opinion of the value of the land. But this pretense is no more bald and destitute of foundation in truth than that of complainant in his bill—feebly sustained by his testimony—that he at this time, or subsequently, believed the land had no value except for the wood and timber thereon. This is shown, not only by the fact known to the complainant of iron upon the land, and the other considerations already mentioned, but by the price of ten thousand dollars which he puts upon it, when, as we are satisfied, complainant would himself have thought one thousand dollars a high price for it as mere timber land, without reference to the show of iron.

It is quite true he may have supposed, when he received Spurr's first letter, that he really wanted the lands for the timber, as Spurr had offered no particular price, but he was led into no belief that this was the only purpose for which the lands were valuable, as is shown by the price he fixes, which is four thousand dollars more than he had been disposed to sell them to Douglass for, and by his declaration that there is a good show of iron upon the lands; and the subsequent correspondence shows plainly

enough that the timber had ceased to cast its shadows over the minds or motives of the parties; and that the prospect that they would prove valuable for iron was the controlling idea with all the parties, notwithstanding the ludicrous attempt of Spurr, in his letter next to be noticed, to preserve his consistency, by pretending to cling to his first love for the timber, which he declares his associates have kindly consented he may enjoy. But complainant was not by this ludicrous pretense deceived into the belief that the lands were only valuable for timber, or that the defendants were purchasing on that account.

After the receipt of complainant's letter of October 10, the defendant Spurr, who was near the land, seems to have gone upon it again previous to the 22d of October, and ascertained that the ore he and Brooks had previously discovered was on this land. The snow at this time was some four or five inches deep, which rendered the examination more difficult. He and his assistant, however, succeeded in finding the iron ore as before, and took specimens of the same with him, which we are satisfied were shown to defendants Brooks and Pumpelly, who were better qualified than complainant to judge of its value from its appearance, —Pumpelly being professor of mining in Harvard University, and Brooks being connected with the state geological survey.

We are also satisfied that these defendants concealed their opinions of the value of the ores, as any man in their situation, speculating in iron lands and contemplating a purchase from another speculator, would be likely to do; and we think it probable that the man who went with Spurr on the second exploration, and who doubtless heard him express his opinion of the value of the ores, was cautioned, and perhaps paid for keeping still about it. An

assay was subsequently made of the specimens obtained, but it does not appear that any assay was made prior to the consummation of the purchase.

After this second exploration by Spurr, he, on the 22d October, writes to complainant acknowledging receipt of his letter of the 10th of October, and saying: "As you spoke of there being a very good show of iron on it, I thought I would go and look it over; as I showed your letter to a party here that have been dealing some in iron lands, and they sent a man out with me, agreeing that if the show of iron was good they would take an interest and help me pay for it and let me have the timber. They sent a man out with me to make an exploration; but the weather was unfavorable, as the snow fell five inches night before last, and we could not make a thorough exploration; but we found some iron; but, in regard to quantity and quality, could not decide, as we were not prepared to do any digging, and there is so much lean ore in this country that will not pay for shipping, and as the specimens we brought in were not very satisfactory, the party think they would not want to invest at your price without knowing something more about the location; and as the snow is on, and probably will remain till spring, there will be no chance to make any further exploration before that time; but we have concluded to make you a liberal offer of six thousand dollars, to pay one-third down, balance in two equal payments of two thousand dollars each, at one and two years, secured by mortgage. As there have been so many iron shows we considered good, such as the Tilden Mine, Oyster Mine, Iron Cascade Mine, Seal Lake Mine, and many others, where they have spent hundreds of thousands of dollars in opening them, and they have all proved worthless, or did not produce a shipping ore, and are all abandoned on that account, I

think we are taking all the chances and offering you a big price. On receipt of this, please let me hear from you."

To this letter complainant replies on the 29th of October as follows: "Yours of the 23d instant is received; your offer I cannot accept, but will split the difference with you if you wish. I will take eight thousand dollars, and you can make the payments as follows: Four thousand down, and the balance secured by mortgage on the property, two thousand in one year, and two thousand in two years. I consider this a low figure for the property, as I could have taken six thousand dollars for it last winter; but I will sell it now, and as I said before, I consider it quite cheap; as I have been on the property, *and am satisfied there is very good iron on the location.* If you wish to close the bargain at this price, I will sell, but will not consider my offer binding unless taken soon."

Spurr being absent on the 4th of November, when this letter was received, defendants Pumpelly and Brooks opened it, and immediately telegraphed complainant in Spurr's name accepting the offer, and also wrote him, explaining that they were the "party" to whom Spurr had referred in his letter, as having agreed to take an interest with him, and say: "We therefore agree to, and formally accept for John L. Spurr, as his agents and for ourselves, your proposition to sell lands and pay for them eight thousand dollars; one-half down, one-fourth in one year and one-fourth in two years; you giving us a good and sufficient warranty deed for the land when first payment is made, and we secure you the balance of four thousand dollars by mortgage. Mr. R. Pumpelly is going East in a few days, when he will complete the transaction, having full power from Spurr and Brooks to act in the matter. Mr. Pumpelly will write you in a few days when he will

state definitely about the time." (Signed) " T. B. Brooks, Raphael Pumpelly."

This ended the correspondence in reference to the terms of sale; and about the 9th or 10th of December, defendant Pumpelly called upon complainant at his residence in Manlius, New York, and a preliminary written contract of sale was drawn up, and signed by him and complainant, in accordance with the terms agreed upon by the correspondence, providing for the payment within sixty days from that date, of the four thousand dollars (five hundred dollars of which was paid down), and for the execution of the deed by complainant and a mortgage and notes by Pumpelly, stating that there was supposed to be certain incumbrances by way of tax titles, and that if complainant did not extinguish them in sixty days, then he was not to convey except at the option of the purchaser, to take a deed subject thereto without warranty, in which case the price was to be seven thousand dollars instead of eight thousand dollars.

During the interview on this occasion the complainant spoke of the lands as iron lands, and both parties in their conversation treated them as such; and complainant gave Pumpelly to understand that he had seen the exposure of the iron ledges on the land, but said he was willing to sell this land, because he was interested in a much larger tract of iron land near L'Anse, which promised much more speedy development. The subject of timber, or timbered lands, was not spoken of in these conversations.

Complainant, after this preliminary contract, and prior to the 8th of February, 1869, seems to have gone himself or sent some one (from the bill of expenses rendered to Palmer it is rather to be inferred he went himself) to Houghton county, where the lands are situated, and got up the tax titles, and on the 8th of February, 1869, complainant met

defendants Pumpelly and Brooks in the city of New York. The four thousand dollars (including the five hundred dollars previously paid down) were paid, the warranty deed given, and complainant received the mortgage and notes of defendants Pumpelly, Brooks and Spurr for four thousand dollars, payable in one and two years. During this interview also, complainant and all parties spoke of the lands as iron lands, and complainant expressed great confidence in their value for iron ore, and nothing was said of them as timbered lands.

The purchase was thus closed, apparently to the entire satisfaction of complainant, and it may not be amiss to inquire when and under what circumstances complainant became dissatisfied and first complained of fraud on the part of the defendants.

Complainant having reported this sale to Palmer about the middle of April, 1869, and sent him the note of two thousand dollars, due in one year, and less than his one-third of the money, Palmer, who believed the land was worth more than it had been sold for, and not having been con-sulted, as soon as he learned the facts connected with the sale, repudiated it.—See *Palmer v. Williams, supra.*

But in June, 1869, before Palmer had learned the facts or brought his bill to set aside the sale as to his one-third, complainant was up in Houghton county (where the lands are), and met Palmer there, and they had several conversations there about the sale; Palmer insisting that complainant had sold his (Palmer's) interest without authority. Complainant still had large interests in iron lands in that region, in part of which Palmer was also interested. During this period, while Williams was up there, it was the common talk and belief among the people there, that the lands in question had been found, or were believed to be, of very great value for iron, though it had not been opened or

worked, and was not, even up to the time the evidence in this cause was taken; and the evidence shows that until thus opened and worked, it cannot be known whether it will prove of much value or not. Complainant seems to have made no complaint of being defrauded until long after Palmer had filed his bill against him and Pumpelly, Brooks and Spurr to set aside the sale as to the one-third, when, as he had given a warranty deed, it began to be apparent he might be held responsible on his covenant, and when, as he says, Palmer rather advised him to bring a bill to set aside the whole sale. But he says it was not till February or March, 1870, that he first became aware that Spurr, Brooks and Pumpelly knew of the existence of valuable iron ore on the land before they purchased, and intimates that if he had known it, he would not have sold it as he did. This was some six months at least, after it had become notorious in all the mining country that this was believed to be one of the most valuable iron tracts in the whole iron region, and when it was estimated any where from sixty thousand dollars to one hundred and twenty thousand dollars. And it was not till the 15th of May, 1870, that complainant applied to defendants to rescind the sale, or notified them that he claimed it to have been fraudulent, and offered to pay back the money he had received and to return the notes and mortgages.

Such are all the material facts in the case, and, so far from sustaining the main ground upon which complainant rests his claim to relief—that up to the time of the sale he supposed and believed the lands had no value except for the wood and timber, and was ignorant that they had any value as iron lands, and that he was misled into or confirmed in this belief by the acts, representations, or concealment of the defendants—the evidence clearly and affirmatively shows that such ignorance and such belief, on his

part, is a sheer pretense, not only unsupported, but clearly disproved, by the evidence. It shows that he was, and for some time had been, dealing in iron lands in that region as a speculator; that these lands were entered by him as such, after he had discovered the iron upon them, and with a view to their sale as iron lands, spoken of, offered and treated as such on all occasions, and the price previously, and upon this sale, fixed upon this basis, and not at all with reference to their value as timbered lands; that the value of the mines upon these lands, like that of all others which had not been opened or worked, was in a great measure speculative, in which hope, anticipation, and visions of future possibilities, rather than actual knowledge or present realities, constituted the controlling elements; that though some opinion of the chances might be formed from the surface show, yet, however favorable this might be, until opened and worked, the real value could not be known, and the purchase must be much in the nature of a lottery.

Complainant had himself been on the lands and seen the exposure of the iron ore in place, or in the ledge, at several places, as well as the boulders, or float ore. And though the defendants, previous to his letter of October 10, had not informed him that they had examined the lands, yet when he informed them that there was a good show of iron upon them, and proposed to sell them for ten thousand dollars, this was equivalent to an invitation to them to examine the lands for themselves, and to form their own opinion of its value, for he certainly could not have expected they would purchase at any thing near the price he had fixed without first making an examination. Nor unless they should find what, in their opinion, would render them profitable at that price as iron lands. Nor had he any reason to expect they would report to him their discoveries,

or their real opinion of the character and value of the ores they might find. On both sides they were dealers and speculators in iron lands; there was no relation of confidence between him and them; they were dealing with each other at arm's length; and the whole course of the correspondence shows that each party expected the other to obtain his own information in his own way, and to decide as to the value at his own risk, and that neither was acting in reliance upon the statements of the other as to the value of the lands.

From the evidence it does not appear that the exploration made by the defendants was really any more thorough than that made by complainant, nor does it appear that they had discovered any deposit or exposure of ore which he had not seen. The fair inference from the evidence is that their discoveries upon the ground were substantially the same; both having discovered the same thing, the iron ore in place. It does not appear that complainant took specimens, though he had the same opportunity to do so as the defendants. But the defendants, or some of them, being more scientific, were better qualified to judge of the value of the ore from its appearance, or such other properties or manifestations as might appear without an actual assay; and they had a perfect right, under the circumstances, to make use of their superior and scientific acquirements, which were their own property and not that of complainant, and the latter had no right or claim to profit by the better opinion they might thereby been enabled to form. Had they been employed by him to make an examination for his benefit, or had they stood in any fiduciary relation to him, or had he been ignorant of any show of iron upon the lands, the case might have been different. But under the circumstances, and the relations in which the parties stood to each other in the course of this negotiation, they were not

only at liberty to conceal from complainant any opinion they might have formed of the value of the ores, but any discoveries they might have made, so long as they did nothing to prevent him from making any examination he should choose to make, or from adopting his own course to obtain such information as he might choose to obtain at his own expense and in his own way; and the evidence does not show that they did any thing of this kind, nor that he relied, or expected or intended to rely, for his own opinion of the value, upon any information from them. He clearly relied upon the examination he had himself made, and they relied upon such as they chose to make, and each must abide the result.

The decree of the court below must be affirmed, with costs to defendants, of both courts.

The other Justices concurred.