THEODORE C. SHERWOOD v. HIRAM WALKER ET AL.

*Sale—Mistake—Rescission.*

1. A party who has given an apparent consent to a contract of sale may refuse to execute it, or may avoid it after it has been completed, if the consent was founded, or the contract made, upon the mistake of a material fact,—such as the subject-matter of the sale, the price, or some collateral fact materially inducing the agreement; and this can be done when the mistake is mutual.

2. Where, in such a case, the thing actually delivered or received is different in *substance* from the thing bargained for and intended to be sold, there is no contract; but if it be only a difference in some *quality* or *accident*, even though the mistake may have been the actuating motive to the purchaser or seller, or both of them, the contract remains binding.

3. Where a cow was contracted to be sold upon the understanding of both parties that she was barren and useless for breeding purposes, and it appeared that such was not the case,—

   *Held,* that the vendors had a right to rescind the contract, and refuse to deliver the property.

Error to Wayne. (Jennison, J.) Argued May 3 and 4, 1887. Decided July 7, 1887.

Replevin. Defendants bring error. Reversed. The facts are stated in the opinion.

*William Aikman, Jr. (D. C. Holbrook,* of counsel), for appellants.

*C. J. Reilly,* for plaintiff.

MORSE, J. Replevin for a cow. Suit commenced in justice's court. Judgment for plaintiff. Appealed to circuit court of Wayne county, and verdict and judgment for plaintiff in that court. The defendants bring error, and set out 25 assignments of the same.

The main controversy depends upon the construction of a contract for the sale of the cow.

The plaintiff claims that the title passed, and bases his action upon such claim.

The defendants contend that the contract was executory, and by its terms no title to the animal was acquired by plaintiff.

The defendants reside at Detroit, but are in business at Walkerville, Ontario, and have a farm at Greenfield, in Wayne county, upon which were some blooded cattle supposed to be barren as breeders. The Walkers are importers and breeders of polled Angus cattle.

The plaintiff is a banker living at Plymouth, in Wayne county. He called upon the defendants at Walkerville for the purchase of some of their stock, but found none there that suited him. Meeting one of the defendants afterwards, he was informed that they had a few head upon this Greenfield farm. He was asked to go out and look at them, with the statement at the time that they were probably barren, and would not breed.

May 5, 1886, plaintiff went out to Greenfield and saw the cattle. A few days thereafter, he called upon one of the defendants with the view of purchasing a cow, known as "Rose 2d of Aberlone." After considerable talk, it was agreed that defendants would telephone Sherwood at his home in Plymouth in reference to the price. The second morning after this talk he was called up by telephone, and the terms of the sale were finally agreed upon. He was to pay five and one-half cents per pound, live weight, fifty pounds shrinkage. He was asked how he intended to take the cow home, and replied that he might ship her from King's cattle-yard. He requested defendants to confirm the sale in writing, which they did by sending him the following letter:

"WALKERVILLE, May 15, 1886.
"T. C. SHERWOOD,
            " President, etc.,—
    "*Dear Sir:*  We confirm sale to you of the cow Rose 2d of Aberlone, lot 56 of our catalogue, at five and a half cents per pound, less fifty pounds shrink.  We inclose herewith order on Mr. Graham for the cow.  You might leave check with him, or mail to us here, as you prefer.
                          "Yours truly,
                              "HIRAM WALKER & SONS."

The order upon Graham inclosed in the letter read as follows:

                          "WALKERVILLE, May 15, 1886.
    "*George Graham:*  You will please deliver at King's cattle-yard to Mr. T. C. Sherwood, Plymouth, the cow Rose 2d of Aberlone, lot 56 of our catalogue.  Send halter with cow, and have her weighed.
                          "Yours truly,
                              " HIRAM WALKER & SONS."

On the twenty-first of the same month the plaintiff went to defendants' farm at Greenfield, and presented the order and letter to Graham, who informed him that the defendants had instructed him not to deliver the cow.  Soon after, the plaintiff tendered to Hiram Walker, one of the defendants, $80, and demanded the cow.  Walker refused to take the money or deliver the cow.  The plaintiff then instituted this suit.

After he had secured possession of the cow under the writ of replevin, the plaintiff caused her to be weighed by the constable who served the writ, at a place other than King's cattle-yard.  She weighed 1,420 pounds.

When the plaintiff, upon the trial in the circuit court, had submitted his proofs showing the above transaction, defendants moved to strike out and exclude the testimony from the case, for the reason that it was irrelevant, and did not tend to show that the title to the cow passed, and that it showed

that the contract of sale was merely executory.    The court
refused the motion, and an exception was taken.

The defendants then introduced evidence tending to show
that at the time of the alleged sale it was believed by both
the plaintiff and themselves that the cow was barren and
would not breed; that she cost $850, and if not barren would
be worth from $750 to $1,000; that after the date of the let-
ter, and the order to Graham, the defendants were informed
by said Graham that in his judgment the cow was with calf,
and therefore they instructed him not to deliver her to plain-
tiff, and on the twentieth of May, 1886, telegraphed to the
plaintiff what Graham thought about the cow being with
calf, and that consequently they could not sell her.    The cow
had a calf in the month of October following.

On the nineteenth of May, the plaintiff wrote Graham as
follows:

"PLYMOUTH, May 19, 1886.
"MR. GEORGE GRAHAM,
              "Greenfield,—
"*Dear Sir:* I have bought Rose or Lucy from Mr. Walker,
and will be there for her Friday morning, nine or ten o'clock.
Do not water her in the morning.
              "Yours, etc.,
                        "T. C. SHERWOOD."

Plaintiff explained the mention of the two cows in this let-
ter by testifying that, when he wrote this letter, the order
and letter of defendants were at his house, and, writing in a
hurry, and being uncertain as to the name of the cow, and
not wishing his cow watered, he thought it would do no harm
to name them both, as his bill of sale would show which one
he had purchased.    Plaintiff also testified that he asked
defendants to give him a price on the balance of their herd at
Greenfield, as a friend thought of buying some, and received
a letter dated May 17, 1886, in which they named the price
of five cattle, including Lucy at $90, and Rose 2d at $80.
When he received the letter he called defendants up by tele-

phone, and asked them why they put Rose 2d in the list, as
he had already purchased her.   They replied that they knew
he had, but thought it would make no difference if plaintiff
and his friend concluded to take the whole herd.

The foregoing is the substance of all the testimony in the
case.

The circuit judge instructed the jury that if they believed
the defendants, when they sent the order and letter to plaint-
iff, meant to pass the title to the cow, and that the cow was
intended to be delivered to plaintiff, it did not matter
whether the cow was weighed at any particular place, or by
any particular person; and if the cow was weighed afterwards,
as Sherwood testified, such weighing would be a sufficient
compliance with the order; if they believed that defendants
intended to pass the title by the writing, it did not matter
whether the cow was weighed before or after suit brought, and
the plaintiff would be entitled to recover.

The defendants submitted a number of requests, which
were refused.   The substance of them was that the cow was
never delivered to plaintiff, and the title to her did not pass
by the letter and order; and that under the contract, as evi-
denced by these writings, the title did not pass until the cow
was weighed and her price thereby determined; and that, if
the defendants only agreed to sell a cow that would not
breed, then the barrenness of the cow was a condition prece-
dent to passing title, and plaintiff cannot recover.   The
court also charged the jury that it was immaterial whether
the cow was with calf or not.   It will therefore be seen that
the defendants claim that, as a matter of law, the title to
this cow did not pass, and that the circuit judge erred in
submitting the case to the jury, to be determined by them,
upon the intent of the parties as to whether or not the title
passed with the sending of the letter and order by the defend-
ants to the plaintiff.

This question as to the passing of title is fraught with dif-

ficulties, and not always easy of solution. An examination of the multitude of cases bearing upon this subject, with their infinite variety of facts, and at least apparent conflict of law, ofttimes tends to confuse rather than to enlighten the mind of the inquirer. It is best, therefore, to consider always, in cases of this kind, the general principles of the law, and then apply them as best we may to the facts of the case in hand.

The cow being worth over $50, the contract of sale, in order to be valid, must be one where the purchaser has received or accepted a part of the goods, or given something in earnest or in part payment, or where the seller has signed some note or memorandum in writing. How. Stat. § 6186.

Here there was no actual delivery, nor anything given in payment or in earnest, but there was a sufficient memorandum signed by the defendants to take the case out of the statute, if the matter contained in such memorandum is sufficient to constitute a completed sale. It is evident from the letter that the payment of the purchase price was not intended as a condition precedent to the passing of the title. Mr. Sherwood is given his choice to pay the money to Graham at King's cattle-yard, or to send check by mail.

Nor can there be any trouble about the delivery. The order instructed Graham to deliver the cow, upon presentation of the order, at such cattle-yard. But the price of the cow was not determined upon to a certainty. Before this could be ascertained, from the terms of the contract, the cow had to be weighed; and, by the order inclosed with the letter, Graham was instructed to have her weighed. If the cow had been weighed, and this letter had stated, upon such weight, the express and exact price of the animal, there can be no doubt but the cow would have passed with the sending and receipt of the letter and order by the plaintiff.

Payment was not to be a concurrent act with the delivery, and therein this case differs from *Case v. Dewey*, 55 Mich.

116. Also, in that case, there was no written memorandum of the sale, and a delivery was necessary to pass the title of the sheep; and it was held that such delivery could only be made by a surrender of the possession to the vendee, and an acceptance by him.

Delivery by an actual transfer of the property from the vendor to the vendee, in a case like the present, where the article can easily be so transferred by a manual act, is usually the most significant fact in the transaction to show the intent of the parties to pass the title, but it never has been held conclusive. Neither the actual delivery, nor the absence of such delivery, will control the case, where the intent of the parties is clear and manifest that the matter of delivery was not a condition precedent to the passing of the title, or that the delivery did not carry with it the absolute title. The title may pass, if the parties so agree, where the statute of frauds does not interpose, without delivery, and property may be delivered with the understanding that the title shall not pass until some condition is performed.

And whether the parties intended the title should pass before delivery or not is generally a question of fact to be determined by the jury. In the case at bar the question of the intent of the parties was submitted to the jury. This submission was right, unless from the reading of the letter and the order, and all the facts of the oral bargaining of the parties, it is perfectly clear, as a matter of law, that the intent of the parties was that the cow should be weighed, and the price thereby accurately determined, before she should become the property of the plaintiff.

I do not think that the intent of the parties in this case is a matter of law, but one of fact. The weighing of the cow was not a matter that needed the presence or any act of the defendants, or any agent of theirs, to be well or accurately done. It could make no difference where or when he was weighed, if the same was done upon correct

scales, and by a competent person.    There is no pre-
tense but what her weight was fairly ascertained by the
plaintiff.    The cow was specifically designated by this writ-
ing, and her delivery ordered, and it cannot be said, in my
opinion, that the defendants intended that the weighing of
the animal should be done before the delivery even, or the
passing of the title.    The order to Graham is to deliver her,
and then follows the instruction, not that he shall weigh her
himself, or weigh her, or even have her weighed, before
delivery, but simply, "Send halter with the cow, and have
her weighed."

It is evident to my mind that they had perfect confidence
in the integrity and responsibility of the plaintiff, and that
they considered the sale perfected and completed when they
mailed the letter and order to plaintiff.    They did not intend
to place any conditions precedent in the way, either of pay-
ment of the price, or the weighing of the cow, before the
passing of the title.    They cared not whether the money was
paid to Graham, or sent to them afterwards, or whether the
cow was weighed before or after she passed into the actual
manual grasp of the plaintiff.    The refusal to deliver the
cow grew entirely out of the fact that, before the plaintiff
called upon Graham for her, they discovered she was not
barren, and therefore of greater value than they had sold her
for.

The following cases in this Court support the instruction
of the court below as to the intent of the parties governing
and controlling the question of a completed sale, and the
passing of title: *Lingham v. Eggleston*, 27 Mich. 324; *Wil-
kinson v. Holiday*, 33 Id. 386; *Grant v. Merchants' and
Manufacturers' Bank*, 35 Id. 527; *Carpenter v. Graham*, 42
Id. 194; *Brewer v. Michigan Salt Ass'n*, 47 Il. 534; *Whit-
comb v. Whitney*, 24 Id. 486; *Byles v. Colier*, 54 Id. 1; *Scot-
ten v. Sutter*, 37 Id. 526, 532; *Ducey Lumber Co. v. Lane*, 58
Id. 520, 525; *Jenkinson v. Monroe Bros. & Co.*, 61 Id. 454.

It appears from the record that both parties supposed this cow was barren and would not breed, and she was sold by the pound for an insignificant sum as compared with her real value if a breeder. She was evidently sold and purchased on the relation of her value for beef, unless the plaintiff had learned of her true condition, and concealed such knowledge from the defendants. Before the plaintiff secured possession of the animal, the defendants learned that she was with calf, and therefore of great value, and undertook to rescind the sale by refusing to deliver her. The question arises whether they had a right to do so.

The circuit judge ruled that this fact did not avoid the sale, and it made no difference whether she was barren or not. I am of the opinion that the court erred in this holding. I know that this is a close question, and the dividing line between the adjudicated cases is not easily discerned. But it must be considered as well settled that a party who has given an apparent consent to a contract of sale may refuse to execute it, or he may avoid it after it has been completed, if the assent was founded, or the contract made, upon the mistake of a material fact,—such as the subject-matter of the sale, the price, or some collateral fact materially inducing the agreement; and this can be done when the mistake is mutual. 1 Benj. Sales, §§ 605, 606; Leake, Cont. 339; Story, Sales (4th ed.), §§ 148, 377. See, also, *Cutts v. Guild*, 57 N. Y. 229; *Harvey v. Harris*, 112 Mass. 32; *Gardner v. Lane*, 9 Allen, 492; S. C. 12 Allen, 44; *Hutchmacher v. Harris' Adm'rs*, 38 Penn. St. 491; *Byers v. Chapin*, 28 Ohio St. 300; *Gibson v. Pelkie*, 37 Mich. 380, and cases cited; *Allen v. Hammond*, 11 Pet. 63, 71.

If there is a difference or misapprehension as to the substance of the thing bargained for, if the thing actually delivered or received is different in substance from the thing bargained for and intended to be sold, then there is no contract; but if it be only a difference in some quality or acci-

dent, even though the mistake may have been the actuating motive to the purchaser or seller, or both of them, yet the contract remains binding.

"The difficulty in every case is to determine whether the mistake or misapprehension is as to the substance of the whole contract, going, as it were, to the root of the matter, or only to some point, even though a material point, an error as to which does not affect the substance of the whole consideration." *Kennedy v. Panama, etc., Mail Co.,* L. R. 2 Q. B. 580, 588.

It has been held, in accordance with the principles above stated, that where a horse is bought under the belief that he is sound, and both vendor and vendee honestly believe him to be sound, the purchaser must stand by his bargain, and pay the full price, unless there was a warranty.

It seems to me, however, in the case made by this record, that the mistake or misapprehension of the parties went to the whole substance of the agreement. If the cow was a breeder, she was worth at least $750; if barren, she was worth not over $80. The parties would not have made the contract of sale except upon the understanding and belief that she was incapable of breeding, and of no use as a cow. It is true she is now the identical animal that they thought her to be when the contract was made; there is no mistake as to the identity of the creature. Yet the mistake was not of the mere quality of the animal, but went to the very nature of the thing. A barren cow is substantially a different creature than a breeding one. There is as much difference between them for all purposes of use as there is between an ox and a cow that is capable of breeding and giving milk. If the mutual mistake had simply related to the fact whether she was with calf or not for one season, then it might have been a good sale; but the mistake affected the character of the animal for all time, and for her present and ultimate use. She was not in fact the animal, or the kind of animal, the defendants intended to sell or the plaintiff to buy.

66 MICH.—37.

She was not a barren cow, and, if this fact had been known, there would have been no contract. The mistake affected the substance of the whole consideration, and it must be considered that there was no contract to sell or sale of the cow as she actually was. The thing sold and bought had in fact no existence. She was sold as a beef creature would be sold; she is in fact a breeding cow, and a valuable one.

The court should have instructed the jury that if they found that the cow was sold, or contracted to be sold, upon the understanding of both parties that she was barren, and useless for the purpose of breeding, and that in fact she was not barren, but capable of breeding, then the defendants had a right to rescind, and to refuse to deliver, and the verdict should be in their favor.

The judgment of the court below must be reversed, and a new trial granted, with costs of this Court to defendants.

CAMPBELL, C. J., and CHAMPLIN, J., concurred.

SHERWOOD, J. (*dissenting*). I do not concur in the opinion given by my brethren in this case. I think the judgments before the justice and at the circuit were right.

I agree with my Brother MORSE that the contract made was not within the statute of frauds, and that payment for the property was not a condition precedent to the passing of the title from the defendants to the plaintiff. And I further agree with him that the plaintiff was entitled to a delivery of the property to him when the suit was brought, unless there was a mistake made which would invalidate the contract; and I can find no such mistake.

There is no pretense that there was any fraud or concealment in the case, and an intimation or insinuation that such a thing might have existed on the part of either of the parties would undoubtedly be a greater surprise to them than anything else that has occurred in their dealings or in the case.

As has already been stated by my brethren, the record shows that the plaintiff is a banker, and farmer as well, carrying on a farm, and raising the best breeds of stock, and lived in Plymouth, in the county of Wayne, 23 miles from Detroit; that the defendants lived in Detroit, and were also dealers in stock of the higher grades; that they had a farm at Walkerville, in Canada, and also one in Greenfield, in said county of Wayne, and upon these farms the defendants kept their stock. The Greenfield farm was about 15 miles from the plaintiff's.

In the spring of 1886 the plaintiff, learning that the defendants had some "polled Angus cattle" for sale, was desirous of purchasing some of that breed, and, meeting the defendants, or some of them, at Walkerville, inquired about them, and was informed that they had none at Walkerville, "but had a few head left on their farm in Greenfield, and they asked the plaintiff to go and see them, stating that in all probability they were sterile and would not breed." In accordance with said request, the plaintiff, on the fifth day of May, went out and looked at the defendants' cattle at Greenfield, and found one called "Rose 2d," which he wished to purchase, and the terms were finally agreed upon at five and one-half cents per pound, live weight, 50 pounds to be deducted for shrinkage. The sale was in writing, and the defendants gave an order to the plaintiff directing the man in charge of the Greenfield farm to deliver the cow to plaintiff. This was done on the fifteenth of May. On the twenty-first of May plaintiff went to get his cow, and the defendants refused to let him have her; claiming at the time that the man in charge at the farm thought the cow was with-calf, and, if such was the case, they would not sell her for the price agreed upon.

The record further shows that the defendants, when they sold the cow, believed the cow was not with calf, and barren; that from what the plaintiff had been told by defend-

ants (for it does not appear he had any other knowledge or facts from which he could form an opinion) he believed the cow was farrow, but still thought she could be made to breed.

The foregoing shows the entire interview and treaty between the parties as to the sterility and qualities of the cow sold to the plaintiff. The cow had a calf in the month of October.

There is no question but that the defendants sold the cow representing her of the breed and quality they believed the cow to be, and that the purchaser so understood it. And the buyer purchased her believing her to be of the breed represented by the sellers, and possessing all the qualities stated, and even more. He believed she would breed. There is no pretense that the plaintiff bought the cow for beef, and there is nothing in the record indicating that he would have bought her at all only that he thought she might be made to breed. Under the foregoing facts,—and these are all that are contained in the record material to the contract,—it is held that because it turned out that the plaintiff was more correct in his judgment as to one quality of the cow than the defendants, and a quality, too, which could not by any possibility be positively known at the time by either party to exist, the contract may be annulled by the defendants at their pleasure. I know of no law, and have not been referred to any, which will justify any such holding, and I think the circuit judge was right in his construction of the contract between the parties.

It is claimed that a mutual mistake of a material fact was made by the parties when the contract of sale was made. There was no warranty in the case of the quality of the animal. When a mistaken fact is relied upon as ground for rescinding, such fact must not only exist at the time the contract is made, but must have been known to one or both of the parties. Where there is no warranty, there can be no mistake of fact when no such fact exists, or, if in existence,

neither party knew of it, or could know of it; and that is precisely this case. If the owner of a Hambletonian horse had speeded him, and was only able to make him go a mile in three minutes, and should sell him to another, believing that was his greatest speed, for $300, when the purchaser believed he could go much faster, and made the purchase for that sum, and a few days thereafter, under more favorable circumstances, the horse was driven a mile in 2 min. 16 sec., and was found to be worth $20,000, I hardly think it would be held, either at law or in equity, by any one, that the seller in such case could rescind the contract. The same legal principles apply in each case.

In this case neither party knew the actual quality and condition of this cow at the time of the sale. The defendants say, or rather said, to the plaintiff, "they had a few head left on their farm in Greenfield, and asked plaintiff to go and see them, stating to plaintiff that in all probability they were sterile and would not breed." Plaintiff did go as requested, and found there three cows, including the one purchased, with a bull. The cow had been exposed, but neither knew she was with calf or whether she would breed. The defendants thought she would not, but the plaintiff says that he thought she could be made to breed, but believed she was not with calf. The defendants sold the cow for what they believed her to be, and the plaintiff bought her as he believed she was, after the statements made by the defendants. No conditions whatever were attached to the terms of sale by either party. It was in fact as absolute as it could well be made, and I know of no precedent as authority by which this Court can alter the contract thus made by these parties in writing, and interpolate in it a condition by which, if the *defendants should be mistaken in their belief that the cow was barren*, she should be returned to them, and their contract should be annulled.

It is not the duty of courts to destroy contracts when called upon to enforce them, after they have been legally made. There was no mistake of any such material fact by either of the parties in the case as would license the vendors to rescind. There was no difference between the parties, nor misapprehension, as to the substance of the thing bargained for, which was a cow supposed to be barren by one party, and believed not to be by the other. As to the quality of the animal, subsequently developed, both parties were equally ignorant, and as to this each party took his chances. If this were not the law, there would be no safety in purchasing this kind of stock.

I entirely agree with my brethren that the right to rescind occurs whenever "the thing actually delivered or received is different in substance from the thing bargained for, and intended to be sold; but if it be only a difference in some quality or accident, even though the misapprehension may have been the actuating motive" of the parties in making the contract, yet it will remain binding. In this case the cow sold was the one delivered. What might or might not happen to her after the sale formed no element in the contract.

The case of *Kennedy v. Panama, etc., Mail Co.*, L. R. 2 Q. B. 588, and the extract cited therefrom in the opinion of my brethren, clearly sustain the views I have taken. See, also, *Smith v. Hughes*, L. R. 6 Q. B. 597; *Carter v. Crick*, 4 Hurl. & N. 416.

According to this record, whatever the mistake was, if any, in this case, it was upon the part of the defendants, and while acting upon their own judgment. It is, however, elementary law, and very elementary, too, "that the mistaken party, acting entirely upon his own judgment, without any common understanding with the other party in the premises as to the quality of an animal, is remediless if he is injured

through his own mistake." Leake, Cont. 338; *Torrance v. Bolton,* L. R. 8 Ch. App. 118; *Smith v. Hughes,* L. R. 6 Q. B. 597.

The case cited by my brethren from 37 Mich. (*Gibson v. Pelkie*) I do not think sustains the conclusion reached by them. In that case the subject-matter about which the contract was made had no existence, and in such case Mr. Justice GRAVES held there was no contract; and to the same effect are all the authorities cited in the opinion. That is certainly not this case. Here the defendants claim the subject-matter not only existed, but was worth about $800 more than the plaintiff paid for it.

The case of *Huthmacher v. Harris' Adm'rs,* 38 Penn. St. 491, is this: A party purchased at an administrator's sale a drill-machine, which had hid away in it by the deceased a quantity of notes, to the amount of about $3,000, money to the amount of over $500, and two silver watches and a pocket compass of the value of $60.25. In an action of trover for the goods, it was held that nothing but the machine was sold or passed to the purchaser, neither party knowing that the machine contained any such articles.

In *Cutts v. Gulid,* 57 N. Y. 229, the defendant, as assignee, recovered a judgment against D. & H. He also recovered several judgments in his own name on behalf of the T. Co. The defendant made an assignment of and transferred the first judgment to an assignee of the plaintiff,—both parties supposing and intending to transfer one of the T. Co. judgments,—and it was held that such contract of assignment was void, because the subject-matter contained in the assignment was not contracted for.

In the case of *Byers v. Chapin,* 28 Ohio St. 300, the defendant sold the plaintiffs 5,000 oil barrels. The plaintiffs paid $5,000 upon their purchase, and took some of the barrels. The barrels proved to be unfit for use, and the contract was rescinded by consent of the parties. The defendant,

instead of returning all the money paid to the purchasers, retained a portion and gave plaintiffs his note for the remainder. The plaintiffs brought suit upon this note. The defendant claimed that, under the contract of sale of the barrels, they were to be glued by the plaintiffs, which the plaintiffs properly failed to do, and this fact was not known to defendant when he agreed to rescind and gave the note, and therefore the note was given upon a mistaken state of facts, falsely represented to the defendant, and which were known to the plaintiffs. On the proofs, the jury found for the defendant, and the verdict was affirmed.

In *Gardner v. Lane*, 9 Allen, 492, it is decided that if, upon a sale of No. 1 mackerel, the vendor delivers No. 3 mackerel, and some barrels of salt, no title to the articles thus delivered passes.

*Allen v. Hammond*, 11 Pet. 63, decides that if a life-estate in land is sold, and at the time of the sale the estate is terminated by the death of the person in whom the right vested, a court of equity will rescind the purchase.

In *Harvey v. Harris*, 112 Mass. 32, at an auction two different grades of flour were sold, and a purchaser of the second claimed to have bought a quantity of the first grade, under a sale made of the second, and this he was not allowed to do, because of the mutual mistake; the purchaser had not in fact bought the flour he claimed. In this case, however, it is said it is true that, if there is a mutual agreement of the parties for the sale of particular articles of property, a mistake or misapprehension as to the quality of the articles will not enable the vendor to repudiate the sale.

The foregoing are all the authorities relied on as supporting the positions taken by my brethren in this case. I fail to discover any similarity between them and the present case; and I must say, further, in such examination as I have been able to make, I have found no adjudicated case going to the extent, either in law or equity, that has been held in this case.

In this case, if either party had superior knowledge as to the qualities of this animal to the other, certainly the defendants had such advantage.

I understand the law to be well settled that "there is no breach of any implied confidence that one party will not profit by his superior knowledge as to facts and circumstances" equally within the knowledge of both, because neither party reposes in any such confidence unless it be specially tendered or required, and that a general sale does not imply warranty of any quality, or the absence of any; and if the seller represents to the purchaser what he himself believes as to the qualities of an animal, and the purchaser buys relying upon his own judgment as to such qualities, there is no warranty in the case, and neither has a cause of action against the other if he finds himself to have been mistaken in judgment.   •

The only pretense for avoiding this contract by the defendants is that they erred in judgment as to the qualities and value of the animal.   I think the principles adopted by Chief Justice CHRISTIANCY in *Williams v. Spurr,* 24 Mich. 335, completely cover this case, and should have been allowed to control in its decision.   See, also, Story, Sales, §§ 174, 175, 382, and Benj. Sales, § 430.

The judgment should be affirmed.