H. KOOK & CO., Inc. and Andrew L. Wormser, Appellants,

v.

SCHEINMAN, HOCHSTIN & TROTTA, INC., Appellee.

Nos. 610, 611, Dockets 33152, 33153.

United States Court of Appeals
Second Circuit.

Argued June 2, 1969.

Decided July 11, 1969.

Joel M. Leifer, New York City, for appellants.

Michael H. Greenberg, New York City (Graubard & Moskovitz, Peter N. Schiller, John A. Young, New York City, on the brief), for appellee.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

In this day when the operations of the securities market and decisions concerning those operations have created an ever-widening circle of collateral problems, we are asked to determine what effect is to be given options to buy or sell a particular stock when, after the

option has been written, but before it is exercised, the Securities and Exchange Commission suspends trading in the security. Plaintiffs H. Kook & Co. (Kook) and Andrew L. Wormser (Wormser) appeal from Judge McLean's order granting summary judgment in favor of defendant Scheinman, Hochstin & Trotta, Inc. (Scheinman) and dismissing the complaint. Appellants sought to recover $24,004.82 and $6,070.03, respectively, the amount their broker Scheinman debited to their accounts in order to honor the options, over appellants' protests.

The essential facts are undisputed. Kook and Wormser are wise in the ways of the securities market; Kook being a broker dealer and Wormser an officer of another broker dealer. In the transactions before us, however, they apparently were acting on their own accounts as principals. In that capacity, Kook wrote and sold four "straddles"[1] through Scheinman, its broker, on August 8 and 9, 1966, for which it received $3,325 in premiums. Wormser wrote one straddle, also through Scheinman, on August 9, for which he received a premium of $1,000. All of these straddles were in the common stock of Westec Corporation (Westec).

In accordance with the practice of the New York Stock Exchange which requires that each option sold be endorsed by a member broker who thereby guarantees that the purchaser will be able to exercise the option according to its terms, Scheinman made the necessary endorsements. With this act it became more than merely a broker or an agent of appellants.

On August 29, 1966, shortly after these straddles were written, the Securities and Exchange Commission suspended trading in Westec, pursuant to its powers under §§ 15(c) (5) and 19(a) (4) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c) (5), 78s(a) (4).[2] This suspension was renewed every 10 days until May 5, 1969, at which time

---

1. In the jargon of the securities industry, a straddle is a combination of a "put" and a "call." A put, in turn, is an option to sell, and a call is an option to buy. To illustrate a hypothetical put option: On August 9, 1966 Kook agrees to buy 100 shares of Westec at 60 a share at any time that the holder of the option requests up to September 13, 1966. For this, Kook receives as consideration a premium of $1,500. If the price of Westec sells above 60 for the period in question the option probably will not be exercised, since the holder of the option can get a better price for his shares elsewhere. Kook can therefore profit by the amount of the premium. If, however, the price of Westec falls below 60, the option will be exercised and Kook will have to pur-

chase the 100 shares at 60, and may, therefore, be out-of-pocket for more than it received as a premium.

A call is simply the converse situation. Kook agrees to sell 100 shares of Westec at any time between August 9, 1966 and September 13, 1966 at a price of 60. If the price of Westec falls, Kook profits; if the price rises, the option will be exercised and Kook must give up the shares to the purchaser of the call. In this case, therefore, a straddle was an option either to buy or to sell Westec at a given price before a given date. Only the "put" part of the straddles were exercised, and thus we are not concerned with either calls or puts which are not parts of straddles.

2.

"SECURITIES AND EXCHANGE COMMISSION

[File No. 1–4371]

WESTEC CORP.

ORDER SUSPENDING TRADING

August 29, 1966.

The common stock, 10 cents par value, of Westec Corp., being listed and registered on the American Stock Exchange, pursuant to provisions of the Securities Exchange Act of 1934 and all other securities of Westec Corp., being traded otherwise than on a national securities exchange; and

It appearing to the Securities and Exchange Commission that the summary suspension of trading in such securities on such Exchange and otherwise

trading in the stock was permitted to resume. The suspension was ordered after an SEC investigation disclosed that Westec's liabilities far exceeded its assets, its principals had unlawfully manipulated its stock, its financial reports were misleading, and its properties had been sold to corporate insiders at inflated prices.

Upon announcement of the suspension, Kook and Wormser instructed Scheinman not to honor any attempt by option holders to exercise a straddle (i. e., to demand that appellants purchase their Westec stock at the agreed price), during the trading suspension. They also directed Scheinman to return to any optionee the consideration paid for the option and offered to indemnify Scheinman against any loss or expense that it might incur as a result of complying with these instructions.

Scheinman, nevertheless, proceeded to accept delivery of the Westec shares offered pursuant to the straddles. To pay for the shares tendered, the appellee charged $24,004.82 against Kook's account and $6,070.03 against Wormser's account. In refusing to follow appellants' instructions, Scheinman relied upon an "interpretive release," Release No. 34–7920, issued by the SEC which Scheinman insists mitigated the suspension order's broad prohibition to the extent of permitting put and call options on Westec stock to be exercised if purchased prior to the ban.[3] To support this claim,

than on a national securities exchange is required in the public interest and for the protection of investors:

IT IS ORDERED, Pursuant to sections 15(c) (5) and 19(a) (4) of the Securities Exchange Act of 1934, that trading in such securities on the American Stock Exchange and otherwise than on a national securities exchange be summarily suspended, this order to be effective for the period August 29, 1966, through September 7, 1966, both dates inclusive.

By the Commission.

[Seal]                                                Orval L. Dubois,
                                                             Secretary.

Federal Register, Vol. 31, No. 172, p. 11696. Reissued as pertinent here in Federal Register, Vol. 31, pp. 11994, 12543, 12856, 13259, 13611 and 14017."

3.

                                                        "May 28, 1968

"I, Orval L. DuBois, Secretary of the Securities and Exchange Commission, do hereby certify that at a regularly-scheduled meeting of the Commission held on July 19, 1966, the Commission authorized the immediate issuance and publication of a 'policy statement' of the Division of Trading and Markets relating to the post-suspension consummation of securities transactions entered into by brokers and dealers before the Commission suspended trading in the security pursuant to Section 15(c) (5) or Section 19 (a) (4) of the Securities Exchange Act of 1934. That policy statement was embodied in Release No. 7920 under the said Act issued on July 19, 1966, a copy of which is attached hereto and incorporated herein by reference; and, in accordance with the customary practice of the Commission, the release containing the said policy statement was filed with the Federal Register, where it was published on July 26, 1966 (Vol. 31, No. 143).

                                            /s/ Orval L. Dubois
                                                  Orval L. Dubois
                                                  Secretary
                                                  Securities and Exchange
                                                      Commission"

"FOR RELEASE Tuesday, July 19, 1966
SECURITIES EXCHANGE ACT OF 1934
Release No. 7920

            CONSUMMATION OF SECURITIES TRANSACTIONS BY
            BROKER–DEALERS WHEN TRADING IS SUSPENDED

The Securities and Exchange Commission today made public a policy statement of its Division of Trading and Markets relating to the post-sus-

Scheinman also relies upon a letter dated July 21, 1966, from the Chief Counsel of the Division of Trading & Markets of the SEC to the President of the Put and Call Brokers and Dealers Association, Inc. In this communication the Chief Counsel referred to Release No. 34–7920 and went on to declare that if certain conditions indicating good faith on the broker's part were met, "no objection will be raised" because the broker or dealer "completes his contractual obligations in the particular transaction while the suspension is still in effect." [4] Scheinman argues that

pension consummation of securities transactions entered into by brokers and dealers before the Commission suspended trading in the security pursuant to Section 15(c) (5) or Section 19(a) (4) of the Securities Exchange Act of 1934, as amended.

The text of the statement, issued by Irving M. Pollack, Director of the Division, follows:

'A number of questions have been presented recently as to whether, during the period when trading is suspended by order of the Commission pursuant to Section 15(c) (5) or Section 19(a) (4) of the Securities Exchange Act of 1934, a broker or dealer may complete (e. g., by payment or delivery) an agency or principal contract entered into prior to the suspension.

'It is the position of the Division that where the broker or dealer is himself acting in good faith where he is not connected with the activity announced by the Commission as a basis for suspension pursuant to Section 15(c) (5) or Section 19(a) (4), and where he has no reason to believe that his customer is so connected, no objection need be raised under such sections because the broker-dealer completes his contractual obligations in the particular transaction, (e. g., by payment or delivery) while the suspension is still in effect. The Division believes that in each such case, however, he should inform his customer, prior to consummating the transaction, that trading in the security is suspended and of the reasons announced by the Commission for suspending trading.

'A broker-dealer, in deciding whether to consummate such a transaction, must of course consider not only the provisions of Sections 15(c) (5) and 19(a) (4) but also all other applicable provisions of the Federal Securities laws.' "

4.

**"SECURITIES AND EXCHANGE COMMISSION**
Washington, D. C. 20549

Division of
Trading and Markets                                             July 21, 1966

Mr. S. D. Harnden, President
Put and Call Brokers and Dealers
   Association, Inc.
Ninteen Rector Street
New York 6, New York

Dear Mr. Harnden:

In your letter of June 23, 1966 you refer to my letter of July 17, 1962 which discusses the question whether a broker-dealer who has endorsed or guaranteed a put or call before trading was suspended, may, while trading is suspended in the security, acknowledge the exercise of the option by stamping, or do any other act to complete the transaction. You inquire whether there has been any change in the policy outlined in that letter.

As you know, in 1964 Section 15(c) (5) was added to the Securities Exchange Act of 1934 by the Securities Acts Amendments of 1964 and shortly thereafter, in view of this statutory amendment, the Commission rescinded its Rule 15c2–2 under the Act. In addition, the Division has recently reexamined various aspects of the problems relating to consummation, during the period when trading is suspended, of ordinary securities transactions entered into prior to suspension. As a result of this review, Securities Exchange Act Release No. 7920 (a copy of which is enclosed) was published. Under the circumstances, we have reexamined our policy with respect to transactions arising out of put and call options.

he went to considerable lengths to comply with the provisions of the release and the Chief Counsel's letter by requiring all those exercising the option to sign affidavits that they were not connected with Westec or its principals, and that the straddle was indeed owned by the optionee prior to the suspension order. It is not contested that the conditions of the release and the Chief Counsel's letter were met by Scheinman. Moreover, there is nothing to indicate that any of the Westec stock tendered to Scheinman was acquired after the suspension order became effective.

Kook and Wormser urge most strenuously that Judge McLean erred in declaring that Release No. 34–7920 modified the sweeping language of the suspension order so as to permit the completion of Scheinman's transactions. The Securities Exchange Act, they contend, contemplated that a suspension order would be absolute; that Congress intended that no trading in any form, including the exercising of prior given options, should be permitted. The argument rests primarily on § 15(c) (5) of the 1934 Act, which reads, in part: "No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in or to induce the purchase or sale of any security in which trading is so suspended."

But we are not persuaded that there is any such inconsistency between §§ 15(c) (5) and 19(a) (4) on the one hand, and the SEC's interpretive release on the other. While the legislative history is not as informative as we would like it to be, it appears that the reason for enactment of § 19(a) (4), and its corollary for non-exchange transactions 15(c) (5) (added in 1964), was, at least in part, to preserve the status quo via the issuance of a suspension order in cases where sudden developments made informed and ra-

If a broker or dealer who has endorsed or guaranteed a put, call or straddle for a particular security prior to the suspension of trading in that security pursuant to Section 15(c) (5) of the Act, is himself acting in good faith, if he is not connected with the activity announced by the Commission as a basis for suspension of trading, and if he has no reason to believe that his customer is so connected, no objection will be rasied under that section because the broker or dealer completes his contractual obligations in the particular transaction (e. g., by delivery or payment against the option presented), while the suspension is still in effect, provided, however that the person presenting a put option (or his principal), or the person to whom a call option is presented (or his principal) then owns the securities which are the subject of the option (i. e., they don't have to effect additional transactions to acquire the securities to be delivered). In the event the underlying securities are not so owned, no objection would be raised if, assuming the same conditions are met, the option is presented to and stamped by such broker or dealer in order to prevent lapse or expiration of the option. Under no circumstances, however, should a broker-dealer, acting either as principal or as agent, while the suspension is in effect, purchase or offer to purchase the securities in order to be able to make delivery in performance of the exercise of the option.

The Division believes that in each case where a broker or dealer, pursuant to the above position, determines to stamp or complete his obligations (e. g., by payment or delivery) under an option, he should inform his customer prior to taking such action that trading in the security is suspended and of the reasons announced by the Commission for suspending trading.

As the enclosed release points out, in these situations a broker-dealer must consider not only the provisions of Sections 15(c) (5) and 19(a) (4) of the Securities Exchange Act, but also all other applicable provisions of the federal securities laws.

Sincerely yours,

/s/ R. Block

Robert Block

Chief Counsel"

tional trading in a particular security difficult. See Hearings on S. 1178–82 before the Subcommittee of Senate Committee on Banking and Currency, 86th Cong., 1st Sess. at 351 (1959); 2 Loss, Securities Regulation 851–55 (1961). Thus the logic of the provision does not apply to a case such as this in which the parties had already committed themselves to a position in Westec stock before the emergency arose.

Manifestly, if the facts concerning Westec had become public causing the price of the stock to fall sharply and the SEC had failed to suspend Westec trading, Kook and Wormser clearly would have been obligated to honor the straddles. Thus, while appellants were binding themselves, by choosing to trade in straddles, to go through with a bad bargain they now assert, in substance, that because the performance of the company whose security was being traded was so wicked that the SEC was compelled to suspend trading, they have been relieved of their bad bargain. We do not agree.

Moreover, we are well aware that the laws governing the securities market become more intricate and finely spun daily. Some engaged in the business of securities trading believe themselves to be characters from Victorian novels wandering aimlessly on treacherous moors. There is much appeal in the contention that brokers and dealers should be able to rely on the few signposts that appear in this confused terrain. Release No.

34–7920 was a policy statement carefully prepared by the SEC's Division of Trading and Markets and authorized for release by the Commission itself after due consideration. The Chief Counsel's letter to the President of the Put and Call Brokers Association was also drafted in the knowledge that the industry would place heavy reliance on it.[5]

■ Appellants' other objections may be dealt with briefly. They contend that, regardless of the effect of the release on the suspension order, they were excused from the obligations of the contracts because both parties were suffering from a basic misconception as to facts concerning the subject matter of the contract—the quality of the Westec stock. Before the SEC investigation, they claim, everyone believed Westec to be a financially solid corporation and it was on this assumption that the straddles were written. The argument rests in part on an ancient case revered by teachers of contract law, Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887) (Rose II of Abalone).

While the mention of the case and the doctrine it espoused brings a flood of nostalgia, it does not furnish a flood of light on this case. Scheinman argues that appellants acted as insurers and, for a premium, undertook to bear the risk of a decline in the price of Westec so that the purchasers of the straddles would be safe from loss. Kook and Wormser respond, however, that strad-

5. The parties dispute heatedly whether the Release was a "rule" upon which the industry could properly rely for freedom from liability under § 23(a) of the Act, 15 U.S.C. § 78w(a), or merely a "release." Because we find no inconsistency between the provisions of § 19 and § 15 of the Act and the release we need not decide this question.

Also, Kook and Wormser contend that no more weight should be given the release and the Chief Counsel's letter than to a letter the Director of the Division of Trading and Markets wrote plaintiff's attorney, after this action was commenc-

ed. In that letter, dated July 21, 1966, the Director responded to a question as to the effect the release would have on private actions by stating "These policy statements were not intended as opinions respecting the civil liability of parties to particular transactions." But this amounts to no more than a statement that the Director would give no ruling or make any comment on a suit already pending. Moreover, this letter was clearly not intended to serve as a general guideline, while the release and Chief Counsel's letter were.

dles are merely inexpensive ways to speculate in volatile stocks. In either event, it seems clear that Kook and Wormser were well aware that the price of Westec might decline suddenly and sharply for any of a variety of reasons and they accepted a substantial payment for assuming that risk. That they guessed wrong as to the direction of the stock's movement or the precise reason for such trend does not relieve them of the risk they were paid to bear. See 5 Williston, Contracts § 1543 (1937).[6]

Finally, appellants contend that Scheinman was merely their agent and since it disobeyed their instructions, the broker should be liable for the resulting injury. Scheinman, however, as we have already indicated, was not merely an agent but the guarantor of the transaction. Indeed, Kook and Wormser would have been prevented from selling the options at all if a broker dealer failed to endorse them. Accordingly, if Scheinman had followed appellants' instructions, it would have become liable to the option holders, who were, as we have shown, entitled to demand payment for their stock. In these circumstances, it was not improper for the broker to honor the options, rather than incur a considerable loss. See Restatement (Second) of Agency § 439(b) (1958). Cf. Assets Realization Co. v. Roth, 226 N.Y. 370, 123 N.E. 743 (1919) (Cardozo, J.).

We have considered the other points raised by appellants and conclude they do not merit reversal. Accordingly, we affirm Judge McLean's order.

6. This logic also applies to appellants' contention that the imposition of the suspension order in effect destroyed the "subject matter" of the contract, by making the stock unmarketable, thus releasing appellants from the obligation to perform. This too was part of the risk Kook and Wormser assumed. Westec is again being traded freely on the market now that the suspension has been lifted, so it may

be argued that the "subject matter" was never "destroyed." The corollary to this argument is that it was only fortuitous that the suspension order was not lifted before the option was exercised. We note further that we are not faced with the question which would be posed if individuals were forced into a non-existent market to redeem a put or satisfy a call.