UNITED STATES of America

v.

Luis Humberto BARBOSA.

No. CRIM. 98–383.

United States District Court,
E.D. Pennsylvania.

June 8, 1999.

598

Judy Goldstein–Smith, Asst. U.S. Atty., United States Attorney's Office, Philadelphia, PA, for U.S.

Mark Wilson, Defender Association of Philadelphia, PA, for defendant.

## MEMORANDUM

DALZELL, District Judge.

Two vexing legal problems are at the center of Luis Humberto Barbosa's sentencing calculus. First, should we sentence Barbosa for heroin, the drug that he intended to possess, or for some form of cocaine, which it turned out (to everyone's surprise) that Barbosa actually possessed? Second, if he should be sentenced for some form of cocaine, should Barbosa, who has a prior felony drug conviction, be sentenced under 21 U.S.C. § 841(b)(1) for "cocaine" (which carries a ten year statutory mandatory minimum) or "cocaine base" (which carries a twenty year statutory mandatory minimum), when the drug he possessed is chemically identified as "cocaine base," but was not "crack"? [1]

### I. Background

Well before the second ship *Peerless* delivered its Bombay cotton on the Liverpool quay [2] and before "Rose" the cow was put out to pasture,[3] a feature of Anglo–American contract law has been the puzzle of mutual mistake of fact.[4] While the "common law" of federal sentencing is of far more recent vintage, it, too, is sometimes bedeviled by similar problems.

Consider Barbosa's case. The record at trial was replete with evidence that the

---

1. For a more detailed analysis of cocaine in its various forms, *see infra.*

2. *See Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng.Rep. 375 (Ex. 1864).

3. *See Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887).

4. *Compare Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887) (holding that the seller of "Rose 2d of Aberlone" could avoid the contract because while both the buyer and seller believed that Rose could not breed at the time of contract formation, at the time of the sale Rose was pregnant, thereby making Rose a different kind of animal than the seller intended to sell and the buyer intended to buy), *with Wood v. Boynton*, 64 Wis. 265, 25 N.W. 42, 44 (1885) (denying seller's attempt to avoid a contract to sell a pretty stone for $1.00, which both the buyer and seller thought was topaz but turned out to be a rough diamond worth $700, because when the sale was made "the value of the thing sold was open to investigation of both parties, neither knowing its intrinsic value, and, so far as the evidence in this case shows, both supposed that the price paid was adequate.").

Drug Enforcement Administration agents in this sting operation (along with the defendant himself) sincerely believed that Barbosa would swallow pellets of heroin, totaling near a kilogram, and then fly from Aruba to the United States where he would pass the contraband and deliver it to the confidential informant and his DEA colleagues.[5] All went precisely according to plan, and after Barbosa's arrest and seizure of the ninety-nine pellets he excreted, the pellets were taken to the DEA laboratory where they were chemically tested to confirm that they indeed contained heroin. To everyone's surprise, the pellets contained 882 grams of 85% pure cocaine base and not heroin.[6]

Even as of the date of Barbosa's sentencing, the origins of this mutual mistake of fact will, it seems, always remain, in the words of the DEA's key informant, a "mystery". It is apparent that we are unlikely to learn the answer to this "mystery" because the likely perpetrator of the bait and switch, one Felix Zorilla, is said to be languishing in an Aruban jail after the authorities on that island found him with seventy-five kilograms of cocaine.

The identity of the substance at issue is highly consequential to this defendant because the Drug Quantity Table at U.S.S.G. § 2D1.1(c) and the mandatory minimum sentences under 21 U.S.C. § 841(b)(1) regard "cocaine base" with much greater severity than "heroin" or "cocaine." Thus, under the Guidelines 882 grams of heroin result in a base offense level of **30**, see U.S.S.G. § 2D1.1(c) Table (5), 882 grams of "cocaine" result in a base offense level of **26**, see U.S.S.G. § 2D1.1(c) Table (7), and 882 grams of "cocaine base" result in a base level of **36**, see U.S.S.G. § 2D1.1(c) Table (2).[7]

Therefore, at a Criminal History III, Barbosa is facing three Guidelines-based sentencing ranges: 121–151 months for heroin, 78–97 months for cocaine, and 235–293 months for cocaine base.

Against these sentencing ranges, however, we must overlay the statutory mandatory minimum sentence applicable under 21 U.S.C. § 841(b)(1) because Barbosa has a prior felony drug conviction.[8] For one with a prior felony drug conviction, the mandatory minimum sentence is ten years for 882 grams of heroin, see 21 U.S.C. § 841(b)(1)(B)(i), ten years for the same amount of cocaine, see 21 U.S.C. § 841(b)(1)(B)(ii), but twenty years for the same amount of cocaine base, see 21 U.S.C. § 841(b)(1)(A)(iii).

---

5. Both before trial and after the close of the Government's case, Barbosa moved to dismiss the Indictment because of the Government's outrageous conduct. Barbosa claimed that the grave dangers of drug swallowing make it a *per se* violation of due process for the Government to engage any defendant in this activity. Although we are aware that at least two members of our Court of Appeals believe that the outrageousness doctrine of the plurality in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)), "is hanging by a thread," *United States v. Nolan–Cooper*, 155 F.3d 221, 230 (3d Cir. 1998), the Supreme Court has not yet cut that thread. Applying *Russell* and *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), we denied the motion in view of the absence of duress and the presence of defendant's free—indeed, nonchalant—agreement to swallow a kilogram of what everyone thought would be heroin pellets.

6. As Barbosa was convicted of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), the exact identity of the controlled substance was of no moment at trial. *See United States v. Lewis*, 113 F.3d 487, 490 (3d Cir.1997) (holding that the Court determines the identity of the controlled substance at sentencing).

7. In addition, the Presentence Investigation Report, prepared May 6, 1999, and revised on June 1, 1999, recommends a two level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Barbosa objected to this enhancement, and at the sentencing hearing we sustained that objection.

8. Notably, Barbosa's prior felony drug conviction in 1991 also involved the importation of a controlled substance by swallowing wrapped pellets of cocaine.

Depending on the substance that we find for sentencing purposes, therefore, the effective range for Barbosa's sentencing is: 121–151 months for heroin (as the Guidelines exceed the ten year statutory mandatory minimum), 120 months for "cocaine" (the statutory mandatory minimum trumping the lower Guideline range), and either 240 months or 240–293 months for "cocaine base" (depending on whether we apply the statutory mandatory minimum alone, or apply the mandatory minimum in conjunction with the Guidelines). *See infra* (explaining this last alternative in more detail). To this defendant, therefore, the consequences of this mutual mistake of fact are far graver than they were to Messrs. Sherwood and Walker and the charterers of the ships *Peerless*. In view of the importance of this issue, which became evident during Barbosa's trial, immediately after his conviction we ordered the parties to submit memoranda on this point.[9]

## II. *Heroin Versus Some Form of Cocaine*

Turning to the first issue, whether we should sentence Barbosa for the drug he actually possessed (some form of cocaine) or the drug he intended to possess (heroin), the heavy weight of authority holds that Barbosa should be sentenced for the drug he actually possessed—some form of cocaine. *See United States v. Valencia-Gonzales*, 172 F.3d 344, 345–46 (5th Cir. 1999) (holding that a defendant who believed he sold cocaine was properly sentenced under the higher heroin penalty because drug dealers assume the risk of what kinds and amounts of controlled substances they carry); *United States v. Strange*, 102 F.3d 356, 361 (8th Cir.1996) (holding that a defendant who believed he was carrying marijuana was properly sentenced under higher cocaine penalty); *United States v. Salazar*, 5 F.3d 445, 446 (9th Cir.1993) (holding that cocaine, like marijuana, is a controlled substance and regardless of the defendant's knowledge either of the nature or the weight of the substance, he knows that he is importing a controlled substance); *United States v. Obi*, 947 F.2d 1031, 1032 (2d Cir.1991) (holding that the district court properly determined the sentence for heroin, rather than cocaine, even though the defendant believed he was carrying cocaine, and that the *mens rea* requirement for possession of a controlled substance satisfied due process concerns); *United States v. Gomez*, 905 F.2d 1513, 1514–15 (11th Cir.1990) (holding that it was enough that the defendant knew that he was engaging in conduct to introduce some type of illegal substance into the stream of commerce and that he need not have specific knowledge of the particular drug involved as long as he knew he was dealing with a controlled substance).[10]

---

9. The jury rejected Barbosa's entrapment defense. In so doing, it apparently accepted the testimony of the undercover witnesses who reported that Barbosa described himself as something of a Mr. Chips to the students in his school for young drug swallowers.

Although the many recorded conversations demonstrate defendant's intimate knowledge with the details of the drug trade in general and of swallowing in particular, Barbosa in his testimony suggested that he "just knew" the price of heroin in two markets, Aruba and New York City. On cross-examination, he seemed to suggest that this "street" knowledge was the equivalent of, say, the average citizen knowing the price of West Texas Intermediate or Arab Light crude oil, or perhaps of knowing yesterday's closing price on the New York Stock Exchange of IBM. While we cannot take judicial notice of an absence of an Aruban edition of *The Wall Street Journal*, we nevertheless feel confident that there is no analogous publication there or anywhere else that would list, for example, spot and futures prices of Aruban vs. New York heroin, April Colombian cocaine 20's vs. July Venezuelan cocaine 25's, etc. On this point, too, the jury was evidently more taken with the Government's view.

10. Judge Weinstein seems to be the lone voice in opposition to this approach. *See United States v. Cordoba–Hincapie*, 825 F.Supp. 485 (E.D.N.Y.1993). In a thorough canvass of the problem, Judge Weinstein used a "burden-of-proof" structure for mistake of fact cases. Thus, in sentencing a defendant who has been

In response to this line of cases, Barbosa argues that "there is a different dynamic in this case" because the Government's informants and agents gave Barbosa the idea to import heroin, supplied him with the resources to do it, and thus simple equity should dictate that he be sentenced for the drug that the Government and the defendant both believed he was transporting. *See* Barbosa's Memorandum on Sentencing at 4–5.[11]

■ We reject Barbosa's argument because we find no evidence that the Government (or any of its agents) perpetrated the switch from heroin to some form of cocaine, or that any of the parties to the transaction in the United States (including the defendant himself) knew about the switch until the drugs were tested at a DEA laboratory after Barbosa's arrest. Furthermore, to the extent that Barbosa is attempting to raise the entrapment defense once again, we reject it. *See supra* note 9.

Now that we have concluded that Barbosa should be sentenced for the drug that he actually possessed—some form of cocaine—we are left with the more difficult issue of whether Barbosa should be sentenced for "cocaine" or "cocaine base."

### III. *Cocaine versus Cocaine Base*

#### A. *The Science*

There is no dispute about the chemistry of this substance.[12] Cocaine base,

C17H21NO4, occurs naturally in the coca leaf. It is a "base" because it reacts with acids to produce a salt. The naturally occurring compound can be extracted from the coca leaf in the form of a paste. When the coca paste derived from the coca leaf is dissolved in hydrochloric acid (HCl) and water (H2O) it creates a salt, cocaine hydrochloride (C17H22ClNO4), commonly known as cocaine powder or cocaine salt. Cocaine hydrochloride is water-soluble and may be snorted or dissolved in a liquid and injected, but it cannot be smoked because it decomposes at the same temperature at which it evaporates.

There are several ways to convert cocaine hydrochloride back into a base. The most common method is to dissolve the cocaine hydrochloride in water (H2O) and baking soda (NaHCO3) and boil the mixture until it solidifies and dries. When dried, the resulting substance, commonly called "crack" or "crack cocaine", can be smoked, and has the same chemical formula as the naturally occurring cocaine base.

#### B. *What was the Chemical Substance Barbosa Carried?*

At trial, we heard the testimony of Charles L. Cusumano, a DEA-employed expert in forensic chemistry, who, after Barbosa's arrest, tested the powder-like substance found in the pellets that Barbosa had ingested and excreted.[13] Cusuma-

---

convicted of narcotics importation, the district judge should, in Judge Weinstein's view, presume that the defendant was aware of the type of narcotics he carried, subject to affording him the opportunity to rebut this presumption by introducing evidence at the sentencing phase. *See id.* at 531–32. While Judge Weinstein's analysis is attractive, we are compelled by the great weight of contrary appellate jurisprudence, cited above, to reach a different conclusion. *See United States v. Valencia–Gonzales*, 172 F.3d 344, 345 (5th Cir.1999) (rejecting Judge Weinstein's approach in *Cordoba–Hincapie*).

11. At the outset, we note that Barbosa's position in his Sentencing Memorandum (that he wants to be sentenced for heroin) is odd,

given the fact that the penalties for heroin are higher than those for cocaine hydrochloride. *See supra.*

12. A number of appellate decisions have canvassed this science. *See, e.g., United States v. Robinson*, 144 F.3d 104, 107–08 (1st Cir. 1998); *United States v. Sloan*, 97 F.3d 1378, 1381–82 (11th Cir.1996); *United States v. Jones*, 979 F.2d 317, 319 (3d Cir.1992); *see also* Testimony of Charles L. Cusumano, January 27, 1999.

13. In his testimony Cusumano confirmed that cocaine hydrochloride and cocaine base can both appear in a powder-like form, but that they have very different chemical and physi-

no stated that after performing several different laboratory tests on the pellets, it was his expert opinion that the substance contained in the pellets was "consistent with each other", *see* Notes of Testimony at 9, and was "cocaine base" with a purity of eighty-five percent cocaine base. *See id.* at 12. Cusumano also testified that the substance contained in the pellets was *not* cocaine hydrochloride (commonly referred to as "cocaine powder" or "cocaine salt"). *See id.* at 10–11. Furthermore, during Cusumano's testimony, the Government conceded that the substance contained in the pellets was not "crack" cocaine. *See id.* at 18, Statement of Judy Goldstein Smith, Assistant United States Attorney ("The Government has not contended that this is crack. It has contended that it is cocaine base.").[14]

Accordingly, now that we have established that the substance Barbosa was transporting is chemically identified as "cocaine base," but not "crack" cocaine, we next turn to the issue of how to classify this substance for sentencing purposes.

## C. *The Guidelines and Statutory Approaches*

Under the Sentencing Guidelines, as amended in 1993, "cocaine base" must be "crack" cocaine for a defendant to be sentenced to the higher guideline for "cocaine base". *See* U.S.S.G. § 2D1.1(c) Note (D) (" 'Cocaine base,' for purposes of this guideline, means 'crack' "); U.S.S.G., *Appendix C,* Amend. 487 (Nov. 1, 1993) (explaining that forms of "cocaine base" other than "crack", such as coca paste, will be treated as "cocaine" even though they are, scientifically, forms of "cocaine base"); *see also, United States v. James,* 78 F.3d 851,

858 (3d Cir.1996) (holding that for sentences under the Guidelines, the Government must prove by a preponderance of the evidence at sentencing that the form of cocaine base the defendant possessed was actually "crack" cocaine).

If Barbosa's sentence were guided purely by the Sentencing Guidelines, we would sentence him for "cocaine", as the Government has conceded that Barbosa did not possess "crack" cocaine. *See supra.* As noted above, however, Barbosa has a prior felony drug conviction, thereby subjecting him to the mandatory minimum sentencing requirements of 21 U.S.C. § 841(b)(1). Unlike the Sentencing Guidelines, where the Sentencing Commission has artificially chosen a definition for the term "cocaine base", Congress did not define "cocaine base" for purposes of applying 21 U.S.C. § 841(b)(1). Therefore, we must turn to decisional precedent to determine what "cocaine base" means under 21 U.S.C. § 841(b)(1).[15]

In addressing this issue, two circuits have reached different conclusions as to whether the Sentencing Guidelines' definition of "cocaine base", *see* U.S.S.G. § 2D1.1(c), should apply to the *statutory* meaning of "cocaine base" under 21 U.S.C. § 841(b)(1). In *United States v. Palacio,* 4 F.3d 150 (2d Cir.1993), and again in *United States v. Jackson,* 59 F.3d 1421 (2d Cir.1995), the Second Circuit refused to hold that the narrow definition of "cocaine base" the Sentencing Commission created for purposes of the Guidelines was authoritative for purposes of interpreting the mandatory minimum statute. The Second Circuit held that because it had previously construed the definition of "cocaine base" under the mandatory minimum statute in a

---

cal properties. *See* Notes of Testimony of Charles L. Cusumano, at 15–16.

**14.** In addition, Cusumano also testified that cocaine base can exist in many forms, including as "crack" cocaine, *see id.* at 20, but that he did not like to use the term "crack" cocaine because it is a "street" word rather than a scientific term. *See id.* at 18.

**15.** At the outset, we note that our Court of Appeals has not yet ruled on the issue, although it has at least twice specifically reserved it. *See United States v. Bennett,* 100 F.3d 1105, 1111 n. 4 (3d Cir.1996); *United States v. James,* 78 F.3d 851, 858 (3d Cir. 1996).

much broader fashion (*e.g.*, using the scientific definition of "cocaine base" rather than limiting the definition to "crack" cocaine), it would not re-interpret the statute in the absence of new guidance from Congress. *See Jackson*, 59 F.3d at 1422–24; *Palacio*, 4 F.3d at 154.

By contrast, in *United States v. Munoz-Realpe*, 21 F.3d 375 (11th Cir.1994), the Eleventh Circuit reached the opposite conclusion. In *Munoz–Realpe*, the Court, relying solely on the Sentencing Commission's amendment of U.S.S.G. § 2D1.1, *see supra*, abrogated its previous ruling that "cocaine base," as used in 21 U.S.C. § 960(b), was not limited to "crack" cocaine. *See id.* at 376–79. The Eleventh Circuit panel held that the precedential force of its prior decisions had been eroded because Congress, in ratifying by inaction the Sentencing Commission's amendment of the Guidelines in § 2D1.1, suggested that it intends the term "cocaine base" to include only "crack" cocaine. *See id.* at 377–78 ("By allowing the amendment to take effect, Congress has given its imprimatur to the new definition of 'cocaine base'; Congress indicated that it intends the term 'cocaine base' to include only crack cocaine. Because Congress has provided this new definition, we think it is proper for us to look to the Guidelines in determining the meaning of 'cocaine base' in the mandatory minimum statute, especially since both provisions seek to address the same problem.").

We believe the reasoning of *Munoz–Realpe* does not survive the Supreme Court's subsequent decision in *Neal v. United States*, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996). In *Neal*, a unanimous Supreme Court rejected a claim that the Sentencing Commission's revision of § 2D1.1 of the Sentencing Guidelines required reconsideration of the Court's prior interpretation of a related statutory provision. *See id.* at 766–69 (holding that while the Sentencing Commission may have expertise as to the Guidelines, the commission's choice of an alternative methodology

for weighing LSD does not alter the Court's prior interpretation of the mandatory minimum statute).

To explain the Court's unanimous decision in *Neal*, some background is in order. In *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court interpreted the undefined phrase "mixture or substance" in the mandatory minimum provision for LSD, *see* 21 U.S.C. § 841(b)(1)(B)(v), by applying the "ordinary meaning" of those terms and ruling that offenders should be sentenced on an "actual weight" basis— *e.g.*, based on the weight of the drug combined with the weight of the paper which holds the LSD, rather than the weight of the pure LSD alone. *See Chapman*, 500 U.S. at 468, 111 S.Ct. 1919. Two years after *Chapman*, the Sentencing Commission altered the "actual weight" approach to sentencing in favor of a "dose-based" method, in which each dose of LSD was assigned a fixed-weight of 0.4 milligrams. *See* U.S.S.G., Appendix C, Amend. 488 (Nov.1993) (revising U.S.S.G. § 2D1.1).

In *Neal*, the defendant argued that the Sentencing Commission's revised definition of "mixture or substance" controlled the mandatory-minimum sentence calculation under 21 U.S.C. § 841(b). A unanimous Supreme Court rejected this contention, reiterating that *Chapman* defined the terms "mixture or substance" for purposes of 21 U.S.C. § 841(b), and that "[o]nce we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law." *Neal*, 116 S.Ct. at 768–69.

Thus, the Supreme Court held that *Chapman*'s plain meaning interpretation of "mixture or substance" governs the determination of a defendant's *statutory* mandatory minimum sentence under 21 U.S.C. § 841(b), even where the Sentencing Commission adopts a conflicting definition for purposes of the Sentencing Guidelines. *See id.; see also United States v. Novey*,

78 F.3d 1483, 1486 (10th Cir.1996) ("The Sentencing Commission does not have the authority to override or amend a statute.").

### D. *What is "Cocaine Base"?*

 Therefore, applying the "ordinary" chemical definition of "cocaine base," *see supra* (explaining the chemistry of cocaine and cocaine base), rather than the artificial definition the Sentencing Commission chose, we find that the substance Barbosa possessed was "cocaine base" for purposes of the statutory mandatory minimum. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 201, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (holding that when Congress has used technical words or terms of art, the term must be given its technical or scientific meaning). We are fortified in our conclusion by the fact that most of the seven Courts of Appeals that (by our count) addressed the issue held or suggested, prior to the Sentencing Commission's amendment of U.S.S.G. § 2D1.1 in 1993, that "cocaine base" was not limited to "crack" cocaine.[16]

We are also fortified by the reality that, while Justice Scalia described the Commission as "a sort of junior-varsity Congress,"[17] it is nonetheless subordinate in its law-making authority to the Article I, varsity Congress.

### IV. *Barbosa's Sentence*

As we noted at the beginning of this Memorandum, if we chose to sentence Barbosa for "cocaine base," his sentence would be either 240 months (the statutory mandatory minimum) or 240–293 months (the mandatory minimum in conjunction with the sentencing Guidelines range). Because we apply the "ordinary" (and broader) scientific definition of "cocaine base" under the mandatory minimum statute to Barbosa's sentence, rather than the more lenient definition the Sentencing Commission created under U.S.S.G. § 2D1.1, we will sentence Barbosa to the statutory mandatory minimum of 240 months.

As applied to Barbosa, this sentencing analysis unquestionably produces a harsh—though not the harshest—result. Barbosa might, however, do well to consider his own words played for the jury at trial.

At the end of the Government's surveillance videotape, Barbosa is overheard telling the Government's informants, "now it's time to go to work," as he heads towards the bathroom to excrete more pellets. Barbosa well knew that his "work" was illegal under federal law, given his prior felony conviction for precisely the same conduct in the early–1990s. It was thus he who started the chain of events that led to

**16.** *See United States v. Abdul,* 122 F.3d 477, 478 (7th Cir.1997) (explaining that crack is one of several forms of cocaine base and citing opinions in the D.C. Circuit, the Eleventh Circuit, and the Second Circuit which held, prior to the 1993 amendments to the Guidelines, that "cocaine base" was broader than "crack" cocaine); *United States v. Jones,* 979 F.2d 317, 319 (3d Cir.1992) (describing the science of cocaine and explaining that "crack" cocaine is "a" form of cocaine base, but not the only form of cocaine base); *see also United States v. Camacho,* 40 F.3d 349, 354 (11th Cir.1994) (holding that a defendant who distributed cocaine base, but not crack cocaine, prior to 1993 should be sentenced for cocaine base); *United States v. Butler,* 988 F.2d 537, 542–43 (5th Cir.1993) (holding that although a substance does not appear to be crack cocaine, it may nevertheless be cocaine base within the meaning of 21 U.S.C. § 841(b)); *United States v. Lopez–Gil,* 965 F.2d 1124, 1134 (1st Cir.1992) ("Although we continue to believe that Congress indeed was concerned primarily with the crack epidemic in enacting [§ 841(b) ], the Government now persuades us that it does not necessarily follow that the term 'cocaine base' includes *only* crack cocaine." (emphasis in original)); *United States v. Easter,* 981 F.2d 1549, 1558 (10th Cir.1992) (applying the plain meaning rule to the term "cocaine base"); *but see United States v. Shaw,* 936 F.2d 412, 416 (9th Cir. 1991).

**17.** *United States v. Mistretta,* 488 U.S. 361, 427, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting).

finding "cocaine base," rather than "heroin," in the DEA's assay.

Nevertheless, Barbosa can be forgiven if he feels like Dorothy when she said to her dog, "Toto, I don't think we're in Kansas any more." Regrettably, if we pull back the curtain of the Sentencing Commission—the agency statutorily placed to bring anomalies like Barbosa's to Congress's attention [18]—we today find less than Dorothy's quartet did.[19]

---

**18.** In creating the Sentencing Commission, Congress provided in the 1984 Sentencing Reform Act, in what is now codified as 28 U.S.C. § 994(r), that "The Commission, not later than two years after the initial set of sentencing guidelines promulgated under subsection (a) goes into effect, and thereafter whenever it finds it advisable, shall recommend to the Congress that it raise or lower the grades, or otherwise modify the maximum penalties, of those offenses for which such an adjustment appears appropriate."

**19.** For those uninitiated in federal sentencing, since the close of business on October 31, 1998, the Sentencing Commission has no Commissioner. To date, no one has been nominated for any of the seven vacant positions.